THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MOBILE NOW, INC., ) | |
| ) | No. 19 C 5241 |
| Plaintiff, ) | |
| ) | Judge Jorge L. Alonso |
| v. ) | |
| ) | |
| BRIGHTSTAR US, LLC f/k/a, ) | |
| Brightstar US, INC., ) | |
| ) | |
| Defendants. ) | |

## Memorandum Opinion and Order

This case centers around a contract dispute. Plaintiff was one of the largest distributors of wireless telecommunications products for the Sprint Corporation; Defendant was Sprint's exclusive logistics partner to distribute Sprint-branded products. Plaintiff entered into an agreement with Defendant to purchase Sprint-branded telecommunications products. Plaintiff alleges that Defendant breached that agreement when it failed to fulfill certain orders and stopped taking additional orders after Sprint told Plaintiff it was terminating their agreement. Currently pending before the Court are Plaintiff's motion for partial summary judgment and Defendant's motion for leave to file an amended answer. For the reasons stated below, the Court denies Plaintiff's motion for partial summary judgment [84], and grants Defendant's motion for leave to file an amended answer [93].

## Background

The Court takes the following facts from the undisputed portions of the parties' respective pleadings, and the undisputed portions of the parties' respective statements of material

facts.[1] Plaintiff MobileNow is a for-profit corporation organized under Virginia law, with its principal place of business in Virginia. [Dkt. 76 at ¶ 6]. Defendant Brightstar US, LLC is a for-profit limited liability company, organized and existing under Florida law, with its principal place of business in Illinois. [Dkt. 76 at ¶ 3]. Defendant's sole member is Brightstar Corporation, incorporated in Delaware with its principal place of business in Florida. [Dkt. 14 at ¶ 12].

In 2014, Plaintiff became an authorized representative of the Sprint Corporation (hereafter "Sprint) in accordance with an Authorized Representative Agreement ("AR Agreement"). [Dkt. 106-1 at pg. 21 (¶ 1)]. The AR Agreement provided Plaintiff with its only authority to sell Sprint-authorized devices to customers and to enroll those customers as new clients of Sprint. *Id.* (¶ 2). From 2014 to March 2019, Plaintiff sold wireless telecommunications products for Sprint in the United States. [Dkt. 91-1 at ¶ 1]. As a distributor, Plaintiff purchased Sprint-branded mobile phones and related equipment from Defendant—Sprint's exclusive logistics partner for device distribution—and sold those products through Plaintiff's brick-and-mortar-retail locations, e-commerce, cable television, and mobile phone business channels. [Dkt. 76 at ¶ 7]. Plaintiff received commission payments from Sprint for meeting certain sales goals. [Dkt. 91-1 at ¶ 24]. Defendant knew Plaintiff received these payments from Sprint. *Id.*; Dkt. 106-1 at pg. 14 (Defendant's response to ¶ 24).

---

[1] Local Rule 56.1(e) states that each party responding to a statement of fact "must admit the asserted fact, dispute the asserted fact, or admit in part and dispute in part the asserted fact." Despite this requirement, Plaintiff's response to Defendant's Statement of Additional Facts [Dkt. 106-1] appears to respond only to those statements that it disputes. Therefore, because Plaintiff has not provided a response, the Court deems as admitted paragraphs 1-3, 9, 12-13, 24-25, 27, and 29 of Defendant's Statement of Additional Facts.

## I. The 2014 Contract

On September 9, 2014, the parties entered into a written contract (hereafter the "2014 Contract") that provided for Plaintiff to buy, and Defendant to sell, telecommunication products such as mobile phones and accessories. [Dkt. 91-1 at ¶ 3]. The contract's pertinent sections are:

- Section 1, which states that: "[t]his Agreement shall be in effect for a period of one (1) year commencing on the Effective Date [September 9, 2014] (the 'Initial Period') and automatically renews for an additional year (the Initial year and each applicable renewal year shall be known as the 'Term'), subject to the termination provisions set forth in this Agreement." [Dkt. 91-1 at ¶ 5].

- Section 3.7, which contains a set-off provision, that, among other things, states that "Brightstar shall be entitled to collect and receive any and all commissions, activation fees, subsidies, MDF, residual money, or any other moneys due from Sprint to [Plaintiff] (collectively "Sprint Fees") pursuant to any agreement between [Plaintiff] and Sprint. [Plaintiff] acknowledges Brightstar submission of certification and documentation to Sprint showing [Plaintiff]'s failure to pay amounts due to Brightstar as required by this Agreement and expiration of invoice dispute periods shall be deemed sufficient and conclusive evidence authorizing Sprint to pay any such Sprint Fees to Brightstar on a recurring basis until such time as the outstanding balance owed by [Plaintiff] is paid in full."

- Section 5.6, which states, in relevant part: "[t]his Agreement shall automatically terminate on the same day as the Sprint AR Agreement; or specifically by direction of Sprint."

- Section 13, which provides for amendment or modification to the contract by a written and fully executed amendment by the parties. [Dkt. 91-1 at ¶ 6]. The 2014 Contract also states that "[i]n the event of [sic] multiple versions of this Agreement are fully executed, the latter dated Agreement shall control." [Dkt. 91-1 at ¶ 8].

The parties never formally extended the 2014 Contract in writing; however, they dispute whether the contract terminated or whether it renewed automatically, and thus whether it governs the dispute in this case. [Dkt. 91-1 at ¶ 7; Dkt. 106-1 at pgs. 3-4].

## II. Business Dealings

As part of its ongoing business relationship, Plaintiff opened various accounts with Defendants, with each account allocated its own account number. [Dkt. 106-1 at pg. 21 (¶ 8)]. In their ongoing relationship, Plaintiff accrued debt on these various lines of credit. *Id.* (¶¶ 8-9). Plaintiff knew of its multiple accounts with Defendant, and its officers and directors often directed Defendant to apply payments to specific accounts. *Id.* (¶ 9).

For instance, during the 2018 holiday season, Plaintiff placed a large order for Sprint-based postpaid devices—anticipating an increased holiday demand for these devices. (Dep. of Robert Qureshi, Dkt. 106-5, at 76:16–77:17; *see also* Aff. of Joe Kalinoski, Dkt. 106-4 at ¶ 33). Consumer demand didn't meet Plaintiff's expectations and it couldn't sell that much inventory. (Dep. of Robert Qureshi, Dkt. 106-5, at 76:16–77:17; *see also* Aff. of Joe Kalinoski, Dkt. 106-4 at ¶¶ 33–39). In February of 2019, Plaintiff's CEO approached Defendant with a proposal for a payment plan to pay for orders Plaintiff had already placed, received, accepted, and had not returned, while still allowing Plaintiff to place new purchase orders. (Aff. of Joe Kalinoski, Dkt. 106-4 at ¶¶ 33–39). Defendant countered Plaintiff's proposal with its own proposed payment plan. *Id.*; Dkt. 106-4 at pgs. 54-60 (Composite Exhibit H and Exhibit G to Aff. of Joe Kalinoski). The parties settled on the following payment plan:

| | |
|---|---|
| February 15, 2019: | $3,000,000.00 |
| March 4, 2019: | $6,000,000.00 |
| March 15, 2019: | $6,257,380.55 |
| April 1, 2019: | $6,000,000.00 |
| April 12, 2019: | $6,219,477.97 |

Plaintiff made the first two payments in full. [Dkt. 106-1 at pg. 25 (¶¶27-28)]. Plaintiff did not, however, make the full payment on March 15, being short by approximately $159,000.00, but then made that additional payment three days later. [Dkt. 106-1 at pg. 25 (¶ 28);

Dep. of Robert Qureshi, Dkt. 106-5, at 125:5-126:16]. Plaintiff didn't make any additional payments to Defendant after March 18, 2019. [Dkt. 106-1 at pg. 27 (¶ 38)].

## III. The 2017 Contract

In November of 2017, Defendant had a surplus inventory of Quanta Slate 8 Plus tablets and offered Plaintiff the opportunity to purchase them. [Dkt. 106-1 at pg. 22]. On December 5, 2017, Plaintiff expressed interest in purchasing the surplus tablets, and Defendant directed Plaintiff to one of its sales directors, who informed Plaintiff that the sale of these tablets would need to go through an enterprise account. *Id.* Consequently, Plaintiff opened another account, ending in 4427 (the "Enterprise Account"), with Defendant on December 5, 2017 to facilitate the purchase of these tablet devices. *Id.* On December 6, 2017, Plaintiff created a manual purchase order for 2950 units of the surplus tablets from Defendant for a total of $118,000. [Dkt. 91-1 at pg. 23].

On December 11, 2017, the parties entered into another contract (the "2017 Contract"), with an effective date of December 5, 2017. Dkt. 91-5]. This contract "set forth terms whereby [Plaintiff] may purchase Products from [Defendants]." *Id.* Section 1 of the contract states that the "[Plaintiff] hereby agrees that, unless otherwise agreed to by the parties, the terms and conditions of this Agreement shall apply to each Invoice relating to the Products sold by Brightstar to [Plaintiff] under this Agreement." *Id.* Section 4(a) states that "[Plaintiff] shall purchase Products pursuant to this Agreement on a pre-paid basis until such time as [Defendant] calculates and grants credit terms to the company." *Id.* Section 5(b) states that "[o]nce a purchase order is confirmed received by [Defendant], the purchase order cannot be cancelled by either party unless by mutual consent" and that "[o]nce a purchase order is confirmed received by [Defendant],

5

[Defendant] shall have an obligation to deliver to [sic] the terms and conditions of this Agreement and to the specifications (if any) defined [i]n the Product Specification Sheet." *Id.*

The contract does not contain any provision that expressly limits the 2017 Contract to a specific line of credit or account that Plaintiff held with Defendant. *Id.* And unlike the 2014 Contract, the 2017 Contract does not contain a set-off provision. *Id.* The parties dispute whether this 2017 Contract covered all transactions between Plaintiff and Defendant, or whether it governed only those purchases under the Enterprise Account.

## IV. Sprint Terminates the AR Agreement

On March 14, 2019, Defendant first learned that Sprint was considering terminating Plaintiff as an authorized representative, effectively ending its business relationship with Plaintiff. [Dkt. 106-1 at pg. 25 (¶ 29)]. A Sprint representative did not immediately confirm to Defendant that Sprint terminated its AR Agreement with Plaintiff, and refused to provide any details until the night of March 18, 2019, when Sprint confirmed that it was terminating its relationship with Plaintiff the next day. *Id.*

On March 18, 2019, Plaintiff placed new orders under its account ending in 6547 totaling $645,570.72, but Defendant put these new orders on hold while it confirmed whether Sprint would terminate its agreement with Plaintiff, at first telling Plaintiff that a system glitch caused the hold. [Dkt. 106-1 at pg. 25 (¶ 30)]. On March 19, 2019, Sprint advised Plaintiff that its distribution agreement would be terminated in 30 days, effective on April 18, 2019. [Dkt. 91-1 at ¶ 20]. Sprint intended to give Plaintiff time to wind down its operations, hence the delayed effective date. *Id.* Once Defendant confirmed that Sprint had terminated its agreement with Plaintiff, it put all of Plaintiff's orders on hold. On March 20, 2019, Defendant informed Plaintiff, via a letter, that it would be exercising its set-off right, under the 2014 Contract, to the

commissions still owed from Sprint to Plaintiff. [Dkt. 106-1 at pg. 27 (¶ 37)]. On March 26, 2019, Plaintiff responded to Defendant's set-off notice, contesting that it had failed to make its required payments and advising Defendant that its set-off request inaccurately recounted the status between the parties. [Dkt. 106-25]. After that, Defendant contacted and directed Sprint to transmit commission payments due to Plaintiff to itself. In total, Defendant received $8,772,432.13 from Sprint. [Dkt. 73 at pg. 23 (¶ 52)].

By April 2, 2019, Plaintiff had closed all its brick-and-mortar stores across the country. [Dkt. 76 at ¶ 48]. Plaintiff sold some stores, and sold its remaining inventory for approximately $4 million, but even with these added funds, Plaintiff couldn't cover its remaining liabilities to Defendant. [Dkt. 106-1 at pg. 27 (¶ 34)]. This lawsuit followed, and Plaintiff alleges that Defendant violated their agreement by (1) failing to sell it additional inventory during the wind-down period, and (2) redirecting commission payments from Sprint to itself rather than to Plaintiff. Defendant filed counterclaims for monies it claims Plaintiff still owes to it, as well as for its belief that Plaintiff breached their agreement by failing to make the full payment on March 15, 2019.

## Discussion

Pending before the Court are Plaintiff's motion for partial summary judgment and Defendant's motion for leave to file an amended answer. Plaintiff's summary judgment motion asks this Court to enter an order: (1) declaring that the 2017 Contract governs this dispute, and (2) finding that Defendant breached that contract. Defendant's motion for leave to file an amended answer asks this Court to add a sixth additional affirmative defense. The Court addresses the partial summary judgment motion first, and the motion for leave to amend second.

## I. Summary Judgment

Plaintiff argues that the 2017 Contract, rather than the 2014 Contract, governs this dispute. On this point, the parties raise two main questions that the Court must address: (1) did the 2014 Contract expire by its own terms after 2 years, and (2) did the 2017 Contract supplant the 2014 Contract and become the agreement that controlled the entire relationship between the parties.

### A. Legal Standard

A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Jajeh v. County of Cook*, 678 F.3d 560, 566 (7th Cir. 2012). To establish an undisputed material fact, a party "must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, . . . admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). Once the party moving for summary judgment demonstrates the absence of a disputed issue of material fact, "the burden shifts to the non-moving party to provide evidence of specific facts creating a genuine dispute." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). The non-movant must go beyond the allegations of his complaint and "set forth specific facts showing that there is a genuine issue for trial." *Hannemann v. Southern Door County School Dist.*, 673 F.3d 746, 751 (7th Cir. 2012). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," and "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citations omitted) (emphasis in original).

When considering a summary judgment motion, the Court construes all facts and draw all reasonable inferences in the nonmoving party's favor. *Van den Bosch v. Raemisch*, 658 F.3d 778, 785 (7th Cir. 2011). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only competent evidence, i.e., evidence admissible at trial. *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009).

### B.    The 2014 Contract

As an initial matter, the Court notes that the 2014 Contract states that Florida law applies to its terms. In this circuit, a court will apply a valid contract's choice-of-law clause to disputes that arise from that contract. *Kohler v. Leslie Hindman*, Inc., 80 F.3d 1181, 1185 (7th Cir. 1996). The parties do not contest the agreement's validity and further agree that the 2014 Contract contemplates Florida law as the applicable law. Therefore, the Court will interpret the 2014 Contract in accordance with Florida law.

Contract interpretation is a matter of law. *Bombardier Capital Inc. v. Progressive Mktg. Group, Inc.*, 801 So.2d 131, 134 (Fla. 4th DCA 2001). Courts must first examine the contract's plain language for evidence of the parties' intent. *Heiny v. Heiny*, 113 So. 3d 897, 900 (Fla. 2d DCA 2013) (quoting *Murley v. Wiedamann*, 25 So.3d 27, 29 (Fla. 2d DCA 2009)). In doing so, a court "must not read a single term or group of words in isolation." *Am. K–9 Detection Servs., Inc. v. Cicero*, 100 So.3d 236, 238–39 (Fla. 5th DCA 2012) (citing *Delissio v. Delissio*, 821 So. 2d 350, 353 (Fla. 1st DCA 2002)). Instead, courts should reasonably interpret an agreement's text to accomplish its stated meaning and purpose. *Id.* (quoting *Delissio*, 821 So. 2d at 353). To that end, "[w]hen provisions in a contract appear to be in conflict, they should be construed so as to be reconciled, if possible." *Seabreeze Rest., Inc. v. Paumgardhen*, 639 So. 2d 69, 71 (Fla. 2d

DCA 1994). Additionally, courts should interpret contracts in a manner that gives a reasonable meaning to all terms—rather than in a manner that leaves a part unreasonable. *Id.* (quoting *Herian v. Se. Bank, N.A.*, 564 So. 2d 213, 214 (Fla. 4th DCA 1990)).

A contract's "language is ambiguous only if it is susceptible to more than one reasonable interpretation." *Vyfvinkel v. Vyfvinkel*, 135 So. 3d 384, 385 (Fla. 5th DCA 2014) (quoting *BKD Twenty–One Mgmt. Co. v. Delsordo*, 127 So .3d 527, 530 (Fla. 4th DCA 2012)). "A true ambiguity does not exist [in a contract] merely because [the] contract can possibly be interpreted in more than one manner. Indeed, fanciful, inconsistent, and absurd interpretations of plain language are always possible." *Id.* With these principles in mind, the Court turns to the first issue raised by the parties.

### 1.   *Whether the 2014 Contract expired by its own terms*

Plaintiff argues that the 2014 Contract contains clear language that its term expired after two years. In support, Plaintiff points to Section 1, which states:

> This Agreement shall be in effect for a period of one (1) year commencing on the Effective Date (the "Initial Period") and automatically renews for an additional year (the Initial year and each applicable renewal year shall be known as the "Term"), subject to the termination provisions set forth in this Agreement.

Plaintiff focuses on the phrase "an additional year", which it contends can only be interpreted to find that the agreement contemplated a two-year term comprised of an initial year and "an" additional year. Defendant disagrees and points to the subsequent wording of "each applicable renewal year" as support that the contract contemplated automatic renewal every year after the initial one-year term.

Here, construing all facts and drawing reasonable inferences in the non-movant's favor as the Court must, the Court finds that it cannot resolve this dispute based on the contract's plain language. To start, the Court finds the contract ambiguous regarding whether it contemplated an

10

automatic renewal in perpetuity. On one hand, the contract says "an" additional year, and thus the article "an" could suggest a single additional year. On the other hand, the parenthetical phrase immediately following appears to contemplate multiple years by the wording of "each" applicable renewal year. Moreover, the contract contains an express termination section, including a subsection discussing termination by expiration. In that subsection, it states that the parties must provide 45 days' notice prior to the then-current term's end to terminate by expiration. This provision would be nonsensical to include if the contract contemplated only a two-year term to begin with, especially considering the parties' sophisticated status and their repeat and ongoing business dealings. As such, the Court cannot resolve this dispute on the plain language.

Unable to resolve this issue on the text, the Court turns to the parties' course of dealings. Under Florida law, "[w]here the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement." F.S.A. § 672.208. What's more, "[t]he express terms of the agreement and any such course of performance, as well as any course of dealing and usage of trade, shall be construed whenever reasonable as consistent with each other; but when such construction is unreasonable, express terms shall control course of performance and course of performance shall control both course of dealing and usage of trade." *Id.*

In this case, a trier of fact might reasonably conclude that the contract's terms contemplated automatic renewal even past the initial two years. First, including the word "each" in the above-mentioned parenthetical phrase could indicate multi-year renewal. Second, the parties' conduct suggests an ongoing relationship beyond the initial two-years. Indeed, the

11

parties continued to conduct business with one another past 2016, the date when Plaintiff claims the contract expired, and Plaintiff never raised the issue of an expired contract with the Defendant. As such, a trier of fact could find that this supports automatic renewal beyond the first two years.

Furthermore, Plaintiff's argues that the fact that other Sprint dealers contacted Defendant, concerned that the term may have expired, demonstrates that the agreement only had a two-year term. But this sheds little light on what the parties in this case understood the agreement's terms to be. As Defendant's 30(b)(6) witness made clear, these concerns were raised by other dealers in relation to specific interactions with third parties such as banks. (Dep. of David Dunning, Dkt. 91-4, at 67:15-24). Concerns of other Sprint dealers provides little insight as to the relationship between the parties in this case, and it is certainly not conclusive.

To be sure, some courts disfavor automatic renewals in perpetuity. But these courts typically invoke this principle in relation to real property and lease provisions, not commercial contracts. *See, e.g.*, *Chestmasters, Inc. v. Chamoun*, 948 So. 2d 958 (Fla. 4d 2007). Accordingly, disputed evidence in the record precludes summary judgment on whether the 2014 Contract expired automatically after two years.

2.   *__Whether the 2017 Contract controls the entire relationship between the parties__*

Even if the Court concluded outright that the 2014 Contract did not expire by its express terms, the Court must still consider whether the 2017 Contract supplanted the 2014 Contract and governed the entire relationship between the parties. Like the prior agreement, the 2017 Contract contains a choice of law provision, but instead selects New York law as the applicable law. Therefore, the Court will apply New York law when interpreting the 2017 Contract.

Like Florida law, New York law calls for courts to interpret agreements in accord with the parties' intent. *See Slatt v. Slatt*, 64 N.Y.2d 966, 967 (1985). "The best evidence of what parties to a written agreement intend is what they say in their writing." *Slamow v. Del Col*, 79 N.Y.2d 1016, 1018, 594 N.E.2d 918 (1992). Thus, courts must enforce a written agreement that is unambiguous according to the plain meaning of its terms. *See, e.g.*, *R/S Assoc. v. New York Job Dev. Auth.*, 98 N.Y.2d 29, 32, 744 N.Y.S.2d 358, 771 N.E.2d 240 (2002); *W.W.W. Assoc. v. Giancontieri*, 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1990). A contract is unambiguous if the language it uses has "a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion." *Breed v. Insurance Co. of N. Am.*, 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (1978). Thus, if an agreement on its face is reasonably susceptible of only one meaning, a court cannot alter the contract to reflect its personal notions of fairness and equity. *See, e.g.*, *Teichman v. Community Hosp. of W. Suffolk*, 87 N.Y.2d 514, 520, 640 N.Y.S.2d 472, 663 N.E.2d 628 (1996); *First Natl. Stores v. Yellowstone Shopping Ctr.*, 21 N.Y.2d 630, 638, 290 N.Y.S.2d 721, 237 N.E.2d 868 (1968).

Plaintiff argues that the 2017 Contract controlled the parties' entire relationship, pointing out that the 2017 Contract was executed after the 2014 Contract, contains no language limiting it to a specific line of credit, and states that "[n]o other terms, including any pre-printed terms and conditions . . . shall supersede, supplement or amend the terms and conditions[.]" Plaintiff further argues that Defendant's corporate representative effectively conceded during his deposition that the 2017 Contract controlled. In opposition, Defendant argues that the 2017 Contract applied only to the Enterprise account, was executed the same day the Enterprise account was opened, and only applied to "each Invoice relating to the Products sold by Brightstar

13

to Company *under this Agreement*." Further, Defendant argues that Plaintiff misconstrues the testimony of Defendant's corporate representative. Defendant also points to the parties' course of dealings, arguing that Plaintiff opened several different lines of credit for various purposes throughout the parties' business relationship, each of which had its own, separate contract.

The Court finds that ambiguities in the 2017 Contract preclude summary judgment on whether the 2017 Contract governs the entire relationship between the parties. Starting with the text, the contract vaguely states that it governs the sale of "products and/or services," but fails to define those products or services. And although the agreement does not identify any express line of credit over which the contract controls, subsequent sections suggest the 2017 Contract may have governed only particular transactions. Section 4, for instance, states that "[Plaintiff] shall purchase Products pursuant to this Agreement on a pre-paid basis until such time as Brightstar calculates and grants credit terms to the company." The fact that the agreement contemplates pre-payment for goods until Defendant extended credit terms to Plaintiff could be reasonably interpreted to mean that the contract governs only those products purchased under that line of credit. Defendant also point to the phrase "under this Agreement" in section 1 as indicative that the agreement only governed certain transactions. This argument hinges on the premise that only those products purchased under the agreement would be governed by the 2017 Contract. But, without defining products or services, that logic seems circular. Nevertheless, based on the other identified provisions, the Court finds the contract's plain language vague and ambiguous.

Because the Court cannot resolve this conflict on the plain text, the Court may evaluate extrinsic evidence indicating the parties' intent. *See W.W.W. Assoc.*, 77 N.Y. 2d at 162. When an agreement's language is ambiguous, the Court may consider evidence of past practices. *See Karol v. Polsinello*, 127 A.D.3d 1401, 1404, 8 N.Y.S.3d 447 (2015). Where the parties' intent

depends upon a choice between reasonable inferences to be drawn from extrinsic evidence, the trier of fact must determine the contract's interpretation. *See Hartford Acc. & Indem. Co. v. Wesolowski*, 33 N.Y.2d 169, 172, 350 N.Y.S.2d 895, 305 N.E.2d 907 (N.Y. 1973).

Turning to the extrinsic evidence here, disputed facts preclude summary judgment. There is, for instance, disputed evidence that the parties executed multiple agreements during their business relationship governing different aspects of that relationship. Defendant points to a vendor agreement executed in 2016 governing only the sale of pre-paid mobile devices. Furthermore, Defendant points to other accounts Plaintiff opened that were associated with separate, independent governing agreements. (Aff. Joe Kalinoski, Dkt. 106-4, at ¶¶ 15-16). Assuming the truth of these facts, as the Court must at this stage, the Court cannot grant summary judgment to Plaintiff.

The Court also addresses Plaintiff's emphasis on David Dunning's (Defendant's corporate representative) testimony, claiming that his testimony effectively concedes that the 2017 Contract controls the entire relationship between the parties. This reliance is misplaced. Certainly, testimony under Rule 30(b)(6) binds a corporation in the same sense that any individual deposed under Rule 30(b)(1) is "bound" by his or her testimony. *W.R. Grace & Co. v. Viskase Corp.*, 1991 WL 211647, at *2 (N.D. Ill. 1991). But this just means that the witness committed to a position at a particular point in time. *Id.* It doesn't necessarily mean that the witness made a judicial admission that formally and finally decides an issue. *Id.* "Deposition testimony constitutes evidence, nothing more." *Id.* To be sure, Defendant's corporate witness undoubtedly testified to facts beneficial to Plaintiff's position. But that testimony, by itself, does not justify the entry of summary judgment. And resolving whether that extrinsic evidence overcomes the other competing extrinsic evidence supporting a limited reading of the 2017

Contract would require the Court to weigh competing evidence, which the Court cannot do on summary judgment.

What's more, the deposition transcript muddles what topics Dunning testified to in his personal capacity versus as the corporate representative of Defendant. The parties took Dunning's deposition in both his individual capacity and as a corporate representative—which the parties understandably decided to combine into a single deposition. (*See* Dep. of David Dunning, Dkt. 91-4, at 5:6-13). But, with few exceptions, the parties failed to identify what topics Dunning testified to in his personal capacity versus as a corporate designee. And without the subpoena or rider showing the designated topics, the Court cannot resolve what testimony was personal and what was said as Defendant's formal representative, which the parties disagreed on during the deposition. *Id.* at 36:21-37:21. Ultimately, the subpoena would be of little value, as the Court must construe the parties' intent from the contract's text and any applicable extrinsic evidence if the text is ambiguous. An individual employee's testimony or subjective opinions, while relevant in the analysis of extrinsic evidence, is not dispositive.

Finally, because the Court concludes that ambiguities exist with respect to which contract controlled, the Court cannot decide whether Defendant's actions constitute a breach. Again, the 2014 Contract contained a provision permitting Defendant to "set-off" and collect commissions from Sprint for Plaintiff's unpaid debts, whereas the 2017 Contract contained no analogous provision. A trier of fact must resolve these questions. Additionally, for the same reasons, there is no need to address the parties' arguments regarding summary judgment on Defendant's affirmative defenses.

## I. Motion for Leave to Amend

Lastly, the Court addresses Defendant's pending motion for leave to file an amended answer. To start, the Court considers the standard that applies to Defendant's request for leave to amend. Defendant argues that Fed. R. Civ. P. 15(a) applies; Plaintiff argues that Fed. R. Civ. P. 16(b)(4)'s "good cause" standard applies. The Court notes that the initial scheduling order in this case does not contain a deadline for the parties to submit amended pleadings. *See* Dkt. 20. The Court, therefore, understands why Defendant contends that Rule 15 should govern. This position, however, appears to somewhat conflict with Seventh Circuit precedent. *See Alito v. Town of Lisbon*, 651 F. 3d 715, 719-20 (7th Cir. 2011) (endorsing a two-step procedure applying Rule 16(b)(4) before analyzing whether an amendment meets Rule 15(a)(2)'s more liberal standard); *but see Campania Management Co., Inc. v. Rooks, Pitts & Poust*, 290 F.3d 843, 848 n.1 (7th Cir. 2002) (analyzing motion to amend under Rule 15 where scheduling order did not contain deadline to file amended pleadings). The Court need not determine, however, whether Rule 15 or Rule 16 governs because even under Rule 16's heightened standard, the Court finds good cause to permit the amendment.

### A. Rule 16(b)(4)

Rule 16(b)'s "good cause" standard primarily considers a party's diligence in seeking amendment. *Trustmark Ins. Co. v. General & Cologne Life Re of America*, 424 F.3d 542, 553 (7th Cir. 2005) (quoting *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992)). For purposes of Rule 16, the Court assumes that February 5, 2021—the close of fact discovery in this case—operates as the applicable deadline. *See, e.g.*, *Smith v. Honeywell Int'l, Inc.*, No. 10–CV–03345–ES–JAD, 2014 WL 301031, at *5 (D.N.J. Jan. 27, 2014) ("Where a scheduling order sets no amendment deadline, courts have looked to when discovery closed to

determine whether the motion to amend is untimely under Rule 16. Rule 16(b) applies to a motion to amend even when there is no scheduling order deadline, if any possibility to amend the pleadings would expire when discovery closed." (citations omitted) (internal quotation marks omitted)).

Defendant argues that it demonstrated good cause because after taking the depositions for the last two "key witnesses" for Plaintiff, Defendant's counsel consulted with their client, reviewed financial data that the second deponent explained, and then quickly sought leave to amend. These events occurred within five weeks—the time from the last deposition (January 28, 2021) to when Defendant filed its motion for leave to amend (March 11, 2021). Admittedly, this motion came after Plaintiff already filed its motion for partial summary judgment, but there was no deadline or briefing schedule set by the Court when that partial summary motion was filed. Therefore, the Court finds that Defendant exercised sufficient diligence to meet Rule 16's good cause requirement.

    **B.**    **Rule 15(a)(2)**

Having satisfied Rule 16(b)(4), the Court must also consider whether Defendant meets the grounds for amendment under Rule 15(a)(2). *Alito*, 651 F. 3d at 719-20. Rule 15 provides that a party "may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2); *see also Sides v. City of Champaign*, 496 F.3d 820, 825 (7th Cir. 2007) (noting that courts should generally "use their discretion under Rule 15(a) to liberally grant permission to amend pleadings"). "Although leave to amend should be freely given, Fed. R. Civ. P. 15(a), that does not mean it must always be given." *Hukic v. Aurora Loan Servs.*, 588 F.3d 420, 432 (7th Cir. 2009). The Court has "broad discretion to deny leave to amend where there is undue delay, bad faith, dilatory motive, repeated failure to cure

deficiencies, undue prejudice to the [non-moving party], or where the amendment would be futile.'" *Hukic*, 588 F.3d at 432 (quoting *Arreola v. Godinez*, 546 F.3d 788, 796 (7th Cir. 2008)). "Delay on its own is usually not reason enough for a court to deny a motion to amend." *Soltys v. Costello*, 520 F.3d 737, 743 (7th Cir. 2008). The longer the delay, however, "'the greater the presumption against granting leave to amend.'" *Id.* (quoting *King v. Cooke*, 26 F.3d 720, 723 (7th Cir. 1994)). In the end though, the decision to grant or deny a motion to file an amended pleading is a matter purely within a district court's sound discretion. *Id.* (quoting *Brunt v. Serv. Employees Int'l Union*, 284 F.3d 715, 720 (7th Cir. 2002)).

Having concluded no undue delay, the Court turns its focus to whether permitting the amendment will prejudice Plaintiff. Defendant's amendment would add a single affirmative defense related to Plaintiff's financial health and justifying Defendant's decision to halt the shipment of new products. This is not a novel issue. Indeed, the parties questioned witnesses for both the Plaintiff and Defendant at length about Plaintiff's financial health. Moreover, Defendant based its counterclaims, in part, on Plaintiff's financial health leading up to the decision by Sprint to immediately terminate the AR Agreement. As such, the Court finds no prejudice in permitting this additional affirmative defense and grants the motion for leave to amend.

## Conclusion

The Court denies Plaintiff's motion for partial summary judgment [84]. The Court grants Defendant's motion for leave to file an amended answer [93]. The Court directs Defendants to file their amended answer as a separate entry on the docket. This case is set for a status hearing on July 27, 2021 at 9:30 a.m.

**SO ORDERED.**                    **ENTERED:   July 9, 2021**

_____
**JORGE L. ALONSO**
**United States District Judge**